160 So.2d 14

DEPARTMENT OF INDUSTRIAL RELA-
TIONS and Alabama Textile
Products Corp.

v.

Virginia D. CURENTON.

1 Div. 949.

Court of Appeals of Alabama.

Jan. 21, 1964.

W. H. Albritton, Albrittons & Rankin, Andalusia, for appellants.

Agee & Meriwether, Prichard, for appellee.

PRICE, Presiding Judge.

This is an appeal from a judgment of the Mobile Circuit Court allowing appellee's claim for unemployment compensation benefits.

Appellee, Virginia D. Curenton, left her employment with appellant, Alabama Textile Products Corporation, Andalusia, Alabama, on May 24, 1962, giving prior notice of intention to leave. At the time she left she signed a statement of termination of employment, giving as her reason for leaving:

"Quit—moving to Plateau, Alabama. Husband has accepted employment there."

Appellee's claim was denied in the administrative processes of the applicable law.

Her original claim for benefits filed with the Department of Industrial Relations stated as grounds for leaving her employment:

"Had to move with my family to place where my husband's work was located. He could not find work in riding distance of my job."

In appealing from the deputy's determination, she gave as her reason for the appeal:

"I had to move. My husband was unemployed and could not find work in the area. He found a job in Mobile and

worked three months before I came to Mobile."

In her application for leave to appeal to the Board of Appeals from the Appeals Referee's decision, she assigned as ground for her appeal:

"Because I feel that when one has to leave their job for a good personal reason such as mine I am entitled to draw unemployment insurance. It was necessary for me to leave in order to be with my husband."

Appellee thereafter appealed to the Circuit Court which, as heretofore stated, ruled that she was entitled to benefits.

A separate finding of fact and opinion was prepared by the Circuit Judge. In the finding of fact it is recited that the court found that when she left her employment appellee gave as her reason for leaving, "that she intended to move to another locality with her husband; that since the filing of her claim in this court, claimant now claims as a further reason for leaving said employment that said employment has become a physical hardship for her, and was causing her to become increasingly nervous, so much so that it was a danger to her health."

The claimant Curenton admitted that she gave as her excuse for quitting that she was leaving to move to Mobile with her husband and that she gave the same reason in her administrative appeals. But she insisted this was not her only reason for leaving, because it was not unusual for her husband to work away from home. He always came home on weekends and if he was within 100 miles he came every night. Her other reason for quitting was connected with her work. At the time of leaving and for several years prior thereto she worked as a "wrapper." This was a job classification in the Boxing Department of the Laundry. She was assigned permanently to a certain machine on which she averaged $1.69 per hour, but to earn this rate she was required to keep up production. Her supervisor, Mrs. Judson Kelley, used her as a relief operator so frequently it was unusual for her to get 8 hours on her machine. She had to undertake as many as three different relief jobs in one day, in addition to switching back and forth to her own machine, and she had to maintain production in each relief job as well as her own. Some of the relief jobs involved reaching and heavy lifting and because of the additional work she became exhausted and was threatened with nervous collapse. She was discriminated against in her work, in that, she was used in relief work more often than any other worker in her division. The fact that she was discriminated against caused conflict between herself and Mrs. Kelley. Once after she returned from taking sick leave she was put on another girl's job, who was sick, and when that girl returned to work Mrs. Kelley asked claimant to work as a floater so the other girl could have her job back, because the other girl didn't know how to do anything else. Claimant refused to give up the job and this was the commencement of her trouble with Mrs. Kelley. Mrs. Curenton complained to her supervisor about her working conditions, but no effort was made to give her relief or to discontinue the practice of using her as a relief operator. Once she was put on another job and another girl operated her machine. At the end of two weeks she complained to Mrs. Kelley and Mrs. Kelley didn't like it because she complained. A few days later Mrs. Kelley had the whole group together and brought it up that claimant had had the nerve to ask for her average when she was on another job. This was embarrassing to claimant.

Claimant testified she was familiar with the section on grievances in the company's handbook of rules and knew the contents of the notices posted on the bulletin board as to specific procedures for presenting grievances within her department. The one occasion she had to go to anyone above her supervisor she did go through channels. For several weeks she went to see Mrs. Kelley twice daily asking for an interview with John Scherf. Mr. Scherf is the safety director and had nothing to do with griev-

ance procedures. Claimant had had an accident with one of the distributing trucks in the department and Mrs. Kelley called her in and quoted Mr. Scherf as saying that for the slightest infraction of the safety rules claimant was to be terminated immediately. Then she denied to claimant the right to an interview with him. This was during the time claimant worked in distributing and was all of two years before she quit. But after this she never tried to appeal to a superior above Mrs. Kelley because she felt to do so would have jeopardized her job. The company handbook setting out the method of presenting grievances was introduced in evidence. Claimant admitted she talked with Mr. Wallace, the personnel director, at the time she left her employment but made no complaint to him about her working conditions because she felt it would be unpleasant for the people working with her if they were called on to tell about these conditions.

Claimant's husband testified his wife "complained a lot about having to switch jobs so much and having to keep up her average on every job she had to switch to, and she was getting extremely nervous over the situation." He obtained employment in Mobile and his wife moved there in May when their child was out of school.

Mrs. Judson Kelley, testifying as a witness for appellant, stated she had been employed by Alabama Textile Products Corporation at Andalusia, Alabama, for thirty-three years and is Head Supervisor of the Alatex Laundry. The jobs in the laundry are pressing, folding, sorting, boxing, distributing, casing, and service people. There are about 183 people in the laundry department. Seventeen or eighteen persons were employed in the department where claimant worked. Boxing, distributing and wrapping were her jobs. The only machinery used was in the wrapping department and there are four wrapping machines there. Two people worked on each of those four machines and these eight employees are group paid—they share alike. There is a piece rate for these machines and that is divided by the number of people on the machine. Boxing, distributing and wrapping shirts are all different jobs but the three jobs overlap. The employees in these jobs work closely together and are familiar with each other's work. Mrs. Curenton was paid at the same rate for the same work as the other people in the department. When an employee was moved from one position to another, from one group to another, each group would maintain her rate per hour, according to the amount they earned, and it might vary. For example, for boxing shirts there would be one piece rate, another piece rate for distributing shirts and still another for wrapping shirts. They were all geared to yield a specified amount of pay for normal work produced. Moving an employee from one section to another, like boxing, distributing and wrapping would not cut her pay in any way. Sometimes it might even prove to be more. Those jobs are very similar in pay as well as work. The type of work involved in each job involves about the same amount of physical energy and nervous strain. In the course of manufacturing activities it became necessary to transfer employees from one of these sections to another. At times it was necessary for a wrapper to box shirts in order to maintain the flow of production and also to provide the girls with a full eight hours' work. Lucille Biggs, the supervisor in charge of the three groups, had supervision of the transfer of employees from one kind of work to another. The transfer was done in this manner: If there were no shirts to wrap both employees on the wrapping machines were assigned to another job. On occasions one would be sent to another job and the other left to operate the wrapping machine. The decision as to which one would go to another job was usually made by the employees themselves. Several years ago when claimant came back from leave of absence she was first put to distributing. On the second day she told Mrs. Kelley she preferred to do boxing. Mrs. Kelley had explained previously that no boxing job was available at that time, but when there was such a job available she would be changed.

No complaint had been made by claimant within the last year about being shifted from one job to another. There was no decrease in claimant's earnings on account of her being shifted to different jobs within the department. An employee who is shifted continuously during the day from one job to another can keep up her normal production without being under a severe strain. Other employees in the department were required to change from one job to another in order to keep the flow of production going. Mrs. Curenton was not discriminated against in any way in connection with this requirement of change. She had more ability or knowledge about the various jobs within the department than some of the other employees. Of the eight girls on the wrapping machines four were able to change and were changed oftener than the others. Virginia Curenton was one of these. Four were not able to change because of their lack of knowledge. Those who had knowledge of the work were called on to change as often as Mrs. Curenton. The witness could not recall any occasion when she had remarked in the presence of other employees that Virginia Curenton had a nerve to ask for her average on account of being transferred from one job to another within the department. The work sheet showing Mrs. Curenton's average pay, entered every pay day from January 31 through June 6, 1962, was introduced in evidence. Her average hourly earnings on January 31, was $1.65; February 14, $1.69; February 28, $1.67; March 14, $1.66; March 28, $1.69; April 11, $1.70; April 25, $1.70; May 9, $1.67; May 23, $1.62; June 6, $1.40. June 6th was for the last period of time she worked before she terminated.

Mrs. Kelley testified on cross-examination that the piece rates are different for different types of work. If a girl is taken off her job when she has work to do she is paid the hourly average she has earned. If she has no work to do she is given a choice of going home, in which event she would earn nothing, or working and earning say $1.30 an hour if she were put to labelling, for instance. The girls on the wrapping machine where Mrs. Curenton worked, and on one other machine, averaged about $1.69 per hour. The workers on the other two machines were a little slower.

The witness was questioned as to the average earnings of a worker named Estelle Ward. Her answers were that Estelle Ward is a boxer. Her average pay rate is substantially lower than claimant's. When Mrs. Curenton worked with her, which sometimes happened, she worked at the same rate as Estelle Ward. If Mrs. Curenton had work on her machine she didn't leave it. She stayed and made her average of $1.69. It was only when she didn't have work that she was changed from her job. If Mrs. Curenton was moved from her machine and someone else put on it, it was to train an operator, and Mrs. Curenton was paid for being moved. Mrs. Biggs' duties as a supervisor are to instruct, change when necessary, watch the flow of work, keep it going and check the quality. If production lags in one place she is supposed to swap somebody and see that the work is done.

■ An employee who leaves her work voluntarily has the burden of proving good cause connected with her work. Avondale Mills v. Burnett, 268 Ala. 82, 106 So.2d 885.

■ Where a wife leaves her employment to reside with her husband in another locality than that of her employment, her leaving is for a "personal reason" and she is not entitled to unemployment benefits— as she left voluntarily without good cause connected with her work. Ex parte Alabama Textile Products Corporation, 242 Ala. 609, 7 So.2d 303, 141 A.L.R. 87.

■ We have said that the failure of an employee to comply with a reasonable company rule for the processing of grievances, without a just excuse for not following it, may be evidence of a wilful disregard of the consequences. Stewart v. Department of Industrial Relations, 40 Ala.App. 383, 114 So.2d 274.

We are also of opinion that the fact of a total and complete change in reasons for termination of employment may be considered on the question of claimant's good faith. See Stewart v. Department of Industrial Relations, supra.

After a careful consideration of all the evidence it is our conclusion that the claimant failed to establish that she had good cause connected with the work for leaving her employment.

The Judgment of the Trial Court is Reversed and the Cause Remanded.

Reversed and remanded.